# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WILLIAM PORTER,

      *Plaintiff*,

v.

ROBERT F. KENNEDY, Jr., *Secretary of Health and Human Services*,

      *Defendant*.

Civil Action No. 16-2464 (TJK)

## MEMORANDUM OPINION

William Porter, a law school graduate proceeding pro se, is a former Department of Health and Human Services employee. In a previous suit, he brought discrimination claims against his former employer under Title VII, Section 1981, the Rehabilitation Act, and Americans with Disability Act based on alleged events until 2011. Now, he brings similar claims for alleged events from 2011 onward. He asserts that his employer continued to discriminate against him because of his race and disability, and that his supervisor retaliated against him for pursuing administrative remedies for those claims. Defendant moves for summary judgment. For the reasons explained below, Defendant's motion will be granted in part and denied in part.

## I.    Background

Plaintiff is an African-American man who experiences depression, panic attacks, post-traumatic stress disorder, and generalized anxiety disorder. After years of receiving unsatisfactory performance reviews and being repeatedly shuffled around the Department of Health and Human Services, he was fired. This is the second of two suits he has brought against his former employer for alleged discrimination. This suit covers alleged events after 2011.

### A.    Prior Suit

Plaintiff's ill-fated employment with the Department of Health and Human Services ("HHS" or the "Department") began in 2007, when he was hired as a Program Analyst, GS-14, in the Office of the Assistant Secretary for Preparedness and Response ("ASPR"), a component of the Office of Financial Planning and Analysis ("OFPA").  ECF No. 59-10 at 2.  Plaintiff's job involved billing for HHS disaster relief.  ECF No. 57-1 at 20.  His employment was uneventful until 2009, when David Dolinsky became his supervisor.  *See id.* at 85.  Their relationship soured, and the next year Plaintiff filed an Equal Employment Opportunity ("EEO") complaint with the same allegations he presses here: (1) racial discrimination, failure to grant reasonable accommodations, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; (2) disability discrimination, hostile work environment, and failure to provide reasonable accommodations in violation of the Federal Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*; and (3) failure to provide reasonable accommodations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*  That suit's background is set forth in that court's opinion, *Porter v. Sebelius*, 192 F. Supp. 3d 8 (D.D.C. 2016) (*Porter I*), granting in part and denying in part Defendant's motion for summary judgment and denying Plaintiff's cross-motion.  The Court assumes familiarity with *Porter I*'s background and summarizes only the relevant details here.

In 2010, Dolinsky downgraded Plaintiff's performance review from "exceptional" to "unacceptable," the lowest possible rating, citing his alleged discovery that Plaintiff had used improper billing practices and his refusal to "change the way he does things in spite of [Dolinsky] pointing out serious problems."  *Porter I*, 192 F. Supp. 3d at 11; *see also* ECF No. 57-1 at 9–15.  Soon after, Plaintiff filed his first EEO complaint because of negative comments Dolinsky made about two famous African-American men.  *Porter I*, 192 F. Supp. 3d at 11; *see also* ECF No. 57-1 at 16–17

(Dolinsky disliked Louis Farrakhan "because he is a blatant anti-Semite" and Jesse Jackson because "he is know[n] to have cheated on his wife."); ECF No. 51-1 at 19–20.  Plaintiff then sent a series of emails "complain[ing] that he was being harassed by Dolinsky forcing him to remain in his office at all times, by not being assigned any work, and by the way Dolinsky treated him," and alleging that all of this exacerbated his panic attacks.  *Porter I*, 192 F. Supp. 3d at 11.  To avoid contact with Dolinsky, Plaintiff requested that he be relocated to another building and be directly supervised by Jay Petillo, Dolinsky's supervisor, Director of OFPA.  *Id.*  The Department denied the request, determining that Plaintiff was not "disab[led]" under the Rehabilitation Act or ADA and so warranted no reasonable accommodation.  *Id.*  Petillo denied a similar follow-up request from Plaintiff.  *Id.* at 11–12.

Resolving cross-motions for summary judgment, the then-presiding judge granted Defendant's motion on Plaintiff's Rehabilitation Act and ADA claims, holding that Plaintiff was not "disabled" under either statute.  *Porter I*, 192 F. Supp. 3d at 16–18.  But as for Plaintiff's race-based discrimination claims under Title VII, the court found that factual disputes precluded summary judgment for either party.  *Id.* at 13–15.

**B.    This Suit**

Soon after the events that led to Plaintiff's first EEO complaint, in April 2011, Plaintiff was reassigned to TRICARE, HHS's health care program for uniformed service members, for an initial 120-day stint.  ECF No. 59-8 at 2–3.  His TRICARE assignment was extended twice, each time in months-long increments, first in August 2011, and again in November 2011, until May 2012.  *Id.* at 5.  The parties dispute whether Plaintiff requested this assignment and its extensions, or whether they were undertaken against his will.  ECF No. 57 at 5 ("Porter emailed Dolinsky on several occasions to tell him that the [TRICARE] detail was not working out"); ECF No. 59 at 16 ("Plaintiff's detail was extended multiple times, including at Plaintiff's request").  As noted above,

Plaintiff had requested reassignment away from Dolinsky and ASPR. ECF No. 57-1 at 31. But Plaintiff sent a series of emails at the end of October 2011 suggesting he was unhappy at TRICARE and wanted to return to ASPR.[1] Defendant, for her part, points to emails from the same time frame in which Plaintiff insisted on a *longer* extension at TRICARE, agreeing to "stay on the detail" only "[i]f they can go past the 120" days. ECF No. 59-9 at 6. Ultimately, Plaintiff assented to the reassignment and later extensions. *See* ECF No. 59-8.

On March 22, 2012—two months before his TRICARE detail was planned to end—Plaintiff contacted Dolinsky, purporting to "end[] this detail [him]self." ECF No. 57-1 at 73. Dolinsky's reply informed Plaintiff that he could not end his detail unilaterally, instructed him to continue reporting to TRICARE until the detail's designated end date, and threatened disciplinary action if he failed to do so. *Id.* The next day, human resources personnel sent a letter to Federal Occupational Health ("FOH"), a component of HHS, noting that Plaintiff's detail at TRICARE was being ended that day and, should Plaintiff return to ASPR, "[t]he managers fear[ed for] the safety of themselves and others based upon information about his mental health that the employee disclosed in a pleading he filed with the administrative agency" that January. *Id.* at 32. Plaintiff's statement that appeared in the letter read, in part:

> The Plaintiff has become more depressed than he ever has been in is
> life and his anxiety disorder has been uncontrollable even though

---

[1] *See, e.g.*, ECF No. 57-1 at 36 (October 21 email from Plaintiff telling Dolinsky that he will return to ASPR in November); *Id.* at 37 (October 28 email from Plaintiff telling Dolinsky "I am uncertain if I am going to accept another detail at TRICARE. Will my office be ready for me to start moving my things back next week? I am hoping that I can transition next week and be back full time the week following."); *Id.* at 38 (November 3 email from Dolinsky telling Plaintiff his detail at TRICARE would continue for around another 180 days and "[t]here is currently no space for you to return," to which Plaintiff complained "[i]n the last six months, I have only been asked to proof read two papers at TRICARE (with no other work)" and, as a result, was "not well," and "in a deep depression," and requested he have his "old job back"); s*ee also id.* at 75 (admission from Dolinsky that "[i]f we thought [Plaintiff] w[as] coming back, I guess we could have" made space).

> the Plaintiff is on more medication that (sic) he has been in his entire
> life. What is most disturbing is that the Plaintiff has become sui-
> cidal, and his clinical psychologist and psychiatrist have been trying
> to commit the Plaintiff to a hospital, which the Plaintiff has stead-
> fastly refused. The one factor that the Plaintiff's doctors are stating
> is contributing to the Plaintiff's mental deterioration is the treatment
> the Plaintiff is receiving at the hands of the Defendant.

*Id.* On March 28, Plaintiff was placed on administrative leave, instructed to not report to ASPR and, in the interim, to complete a medical assessment before he could return to the worksite. *Id.* at 79–81. Yet, on March 29, 2012, Plaintiff tried to enter the building where ASPR was located and was escorted out by security. *Id.* at 82–83, 91.

By the end of August 2012, FOH had cleared Plaintiff to return to work, contingent upon completing a background investigation for a Top Secret security clearance. ECF No. 57-1 at 94. The parties dispute whether Plaintiff needed a Top Secret security clearance for this job.[2] But in any event, Plaintiff requested such a clearance in November 2012, and it was granted to him in 2013. *Id.* at 102–07.

In mid-2013, Plaintiff was once again reassigned, this time to the Office of Acquisition Management, Contracts and Grants ("AMCG"). ECF No. 57-1 at 112. His title remained the same: Program Analyst, GS-14. *Id.* But, according to Plaintiff, the role was not one for which he

---

[2] According to Plaintiff, he had not needed a Top Secret clearance when he was hired for the same position in 2007, and there was no reason he needed one in 2012. *See id.* at 96 (stating that Plaintiff was placed at "NACI, the lowest level" security clearance, in 2007). Moreover, according to Plaintiff, in 2011 he told Dolinsky that because of financial and marital problems he did not want to be put up for a Top Secret clearance that would allow him to undertake certain duties in emergency management. For this part, Dolinsky says that he told Plaintiff not to push for duties that would require a Top Secret clearance because the agency was unlikely to grant him one because of his mental health and other issues. *See id.* at 99–101. According to Defendant, even though Plaintiff's supervisors did not think that it was necessary, Plaintiff's job description did in fact require a Top Secret clearance. ECF No. 59-6 at 5 (Plaintiff's job requirements); ECF No. 57-1 at 99 (Dolinsky stating that Plaintiff's job description required him to have a Top Secret clearance); *Id.* at 109 (email from Plaintiff's supervisor stating that a Top Secret clearance was unnecessary for Plaintiff to perform his job).

was qualified or trained.  ECF No. 57 at 10–14.  At ASPR he reconciled billing transactions, but at AMCG he was in a policy role responsible for more freeform analysis.  *Id.*at 10–11; *see also* ECF No. 57-2 at 4.  A few months after he was placed at AMCG, he received an "unacceptable performance level" and, as a result, was placed on a Performance Improvement Plan ("PIP") by his new supervisor, Cassandra Freeman.  ECF No. 57-2 at 5; *see also* ECF No. 57-2 at 21.  Plaintiff repeatedly requested that he be reclassified as a "1102 series" employee so that he would be eligible for more training courses, that he not be assigned any "hard deadlines" by which he would have to complete his work, and that he be permitted to telework to avoid any face-to-face meetings that purportedly caused him stress, but Freeman and others in HHS denied those requests for accommodations.  *See, e.g.*, ECF No. 57-2 at 27–29, 32, 42.  The parties agree that Plaintiff was allowed to telework four days per week while at TRICARE, ECF No. 57-1 at 98; ECF No. 59-7 at 4, but Plaintiff claims that he was not "allowed any telework days since [he joined] AMCG," ECF No. 57-2 at 32.

After receiving an unsatisfactory review in February 2014, Plaintiff contacted ASPR management to complain that "I was granted this reassignment (out of OFPA) after I made a Reasonable Accommodation request" and "[t]herefore, I cannot be punished for not knowing the work over here. . . . I walked through these doors (at AMCG), and I promised myself that I was not going to file another EEOC complaint.  However, you need to make this right by making sure that I am properly trained and supported (or sent back over to OFPA), or I will have no alternative but to start filing EEOC complaints again."  ECF No. 57-2 at 31–32.  He subsequently started emailing the senior management at HHS to reiterate his requests for telework, to be free from "hard deadlines" and to be excused from in-person meetings.  *Id.* at 33–42.  The parties dispute whether, after that point, Freeman ceased stopping by Plaintiff's office, which Plaintiff had characterized as

"popp[ing] her head in to say hello . . . which I truly believe Ms. Freeman is now trying to do" to "make the working conditions so stressful that I leave." *Id.* at 36, 51.

In mid-2014, Plaintiff was suspended for one week without pay "for failure to follow instructions," that is, refusing to attend meetings with Freeman.  ECF No. 57-2 at 152–54.  At the end of that year, Freeman notified Plaintiff of her proposal to remove him "based on unsatisfactory performance," explaining that "during the PIP period, the majority of [his] assignments have required substantive revisions" and citing Plaintiff's failure to "improve[] [his] performance to a marginally acceptable level." *Id.* at 5–6.  In February 2015, the Department made a final decision to terminate Plaintiff based on unacceptable performance, rejecting his arguments that Freeman's recommendation was discriminatory.  *Id.* at 48–50.  It denied Plaintiff's request for reasonable accommodations, that he be given "[a]ccess to training that all other employees get so that [he could] compete on a level playing field" as well as a "[c]all in number when not feeling well." ECF No. 57-2 at 43.  The Department explained to him, first, that "adequate training for your position is not actually an accommodation," but it had "verified that since being assigned to AMCG in June 2013 you have taken twenty-six acquisition related training courses for a total of one hundred seventy-five hours of Continuing Learning Points (CLP's).  This certainly qualifies as receiving and taking advantage of the same training opportunities as your peers within AMCG." *Id.* And second, it is "standard" policy that all staff physically in the District of Columbia office "attend[] their Division staff and All hands meetings in person," and thus "[c]all in numbers are provided for staff who are . . . on scheduled telework." *Id.* at 44.  Afterward, Plaintiff filed an EEO complaint alleging that the Department had discriminated against him based on his disability and had retaliated against him for his prior EEO activity.  *See* ECF No. 59-3.

## II.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine

7

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "Summary judgment is appropriately granted when, viewing the evidence in the

light most favorable to the non-movants and drawing all reasonable inferences accordingly, no

reasonable jury could reach a verdict in their favor."  *Lopez v. Council on Am.-Islamic Rels. Action

Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).

　　　To survive summary judgment, a nonmoving party must "go beyond the pleadings and by

her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, des-

ignate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 324 (1986) (internal quotation omitted).  Courts "are not to make credibility determina-

tions or weigh the evidence."  *Lopez*, 826 F.3d at 496 (quoting *Holcomb v. Powell*, 433 F.3d 889,

895 (D.C. Cir. 2006)).  "To the extent the testimony of a witness who is also a party may be

impaired by party self-interest, it is ordinarily the role of the jury—not the court on summary

judgment—to discount it accordingly," and thus "'there is no rule of law that the testimony of a

discrimination plaintiff, standing alone, can never make out a case of discrimination that could

withstand a summary judgment motion.'"  *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016)

(quoting *Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008)); *see also Townsend v. United

States*, No. 15-cv-1644 (BAH), 2019 WL 4060318, at *7 (D.D.C. Aug. 27, 2019) ("The fact that

a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment, since

'[c]orroboration goes to credibility, a question for the jury, not the district court.'") (quoting *Rob-

inson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016)).  But "[t]he mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  *Lopez*, 826 F.3d at

496 (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

## III.    Analysis

Defendant moves for summary judgment on all counts, which allege racial discrimination (Claim I), retaliation (Claims III and VII), and a hostile work environment under Title VII (Claims IV and VI), as well as disability discrimination under the Rehabilitation Act and ADA (Claims II and V).[3]  For the reasons described below, the Court will grant the motion on all counts except Claim III.

### A.    Racial Discrimination under Title VII (Claim I)

Plaintiff alleges that the Department discriminated against him when it denied his request for accommodations (mainly, his requests for reassignment and telework), placed him on administrative leave, and terminated him.  ECF No. 57 at 22–27.  Under Title VII of the Civil Rights Act, federal employers may not discriminate "based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  "Where, as here, the plaintiff has no direct evidence that the adverse employment actions of which [he] complains were caused by prohibited discrimination," the Court applies the *McDonnell Douglas* burden-shifting framework.  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).  In disparate-treatment cases, a plaintiff's prima facia case "consists a showing that '(1) the plaintiff is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'"  *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 255 (D.D.C. 2017) (quoting *Chappell-Johnson v. Powell*, 440 F.3d

---

[3] Plaintiff's complaint labels the last three claims each as "Claim V," in an apparent typographical error.  ECF No. 1 at 26–27.  The Court refers to them as Claims V, VI, and VII.

484, 488 (D.C. Cir. 2006)).

Following completion of the parties' summary judgment briefing, the District of Columbia Circuit overruled prior precedent requiring "objectively tangible harm" under Title VII, holding that "an employer that transfers an employee or denies an employee's transfer request because of the employee's race, color, religion, sex, or national origin violates Title VII by discriminating against the employee with respect to the terms, conditions, or privileges of employment." *Chambers v. District of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022) (en banc), *overruling Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999). Actionable claims, however, "are [still] limited to those where an employer causes 'material adversity,' not 'trivial harms.'" *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (emphasis omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

If a plaintiff makes that showing, "the burden 'must shift to the employer to articulate some legitimate, nondiscriminatory reason for the' adverse action." *Webster*, 267 F. Supp. 3d at 255 (quoting *McDonnell Douglas*, 411 U.S. at 802). The burden then shifts back to the plaintiff to show pretext. *Id.* at 256. But in cases such as this one, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision" there is no need to analyze the plaintiff's prima facie case. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the relevant question becomes: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.*

In answering this question, Plaintiff can point to "the employer's better treatment of

similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). For an employee of a different race to be deemed similarly situated, "[a] plaintiff must . . . demonstrate that all of the relevant aspects of his employment situation were nearly identical to those of the other employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (cleaned up and citation omitted). This other employee is known as a "comparator." *Id.* The similarly situated analysis is flexile and turns on a case's specific facts, but often includes, for example, a comparison between the plaintiff's and compara-tor's job title, duties, supervisor, "and, in cases involving discipline, the similarity of their of-fenses." *Mann v. Washington Metro. Area Transit Auth.*, 168 F. Supp. 3d 71, 83 (D.D.C. 2016).

To repeat, as best the Court can tell, Plaintiff points to three types of harm he suffered allegedly because of racial discrimination: (1) denial of his request for reasonable accommodations of his disability in several ways, (2) placement on administrative leave, and (3) termination. For the reasons explained below, no reasonable jury could find that they were the product of racial discrimination by the Department over the terms, conditions, or privileges of his employment.

### 1.    Denial of Accommodations

#### a.    Training

Plaintiff alleges that he was ultimately fired for poor performance partly because he was barred from benefiting from Department-provided training opportunities that his white co-workers enjoyed. ECF No. 57 at 23–24. To support this contention, Plaintiff points to several requests for what he refers to as "reasonable accommodation[s]" during his employment, including "[a]ccess to training that all other employees get so that [he could] compete on a level playing field" after

being placed on a PIP for unacceptable performance while on detail at AMCG. ECF No. 57 at 14; ECF No. 57-2 at 21–27, 43–46.

But even putting aside whether these training requests were truly requests for a "reasonable accommodation" of his disability, Plaintiff's factual claim is sharply contradicted by the record. And where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Thus, no reasonable jury could conclude that Plaintiff was racially discriminated against on the ground that he was denied generalized training opportunities.

To begin, the agency verified "that since being assigned to AMCG in June 2013 [Plaintiff had] taken twenty-six acquisition related training courses for a total of one hundred seventy-five hours of Continuing Learning Points (CLP's)." ECF No. 57-2 at 43. And that "certainly qualifies as receiving and taking advantage of the same training opportunities as your peers within AMCG." *Id.* Defendant has also provided contemporaneous training certificates verifying Plaintiff's completion of those courses, and nothing in the record contradicts this evidence. *See* ECF No. 59-1, 59-2. And the agency's policy was to pay for its employees' training if approved for it; Plaintiff offers no evidence that he was any exception to that rule. ECF No. 57-2 at 46; *see also* ECF No. 57-1 at 135–42.

Plaintiff also argues that he was offered an inferior *type* of training, in part because he was not a "series 1102" employee. But a jury could hardly conclude that Defendant racially discriminated against Plaintiff by refusing to provide him with training for a position he did not hold and for which he was not qualified. Plaintiff admits that he was not a "series 1102" employee and thus

12

was not entitled to receive the training he identifies.  ECF No. 57 at 11–12.  He also points to the deposition of a Jess Scarboro who testified that Plaintiff lacked the "background" and "number of years" of training it takes to be qualified for a "1102 contracting officer[]" position.  *Id.* at 12; ECF No. 57-2 at 4.  Finally, Plaintiff offers no evidence that his training opportunities—whatever their exact contours—were limited in some way *because of his race*, or that a similarly situated white employee was provided training that he was denied.  For all these reasons, a reasonable jury could not conclude that Defendant's denial of this "reasonable accommodation" for certain training was motivated by racial discrimination.

### b.   Failure to Reassign Plaintiff

Plaintiff was reassigned twice during his tenure at HHS: first in 2011, when he was sent to TRICARE, and again in 2013, when he was assigned to AMCG after returning from administrative leave.  Plaintiff does not argue that those assignments were racially discriminatory—except to the extent, above, he claims he was not provided training as part of his reassignment to AMCG—only that the *denial* of his other requests for reassignment were discriminatory and a failure to accommodate him.  ECF No. 57 at 23–25.  According to Plaintiff's affidavit connected to one of the EEO investigations, by the time he was sent to TRICARE in April 2011, he "had been requesting a detail for over a year in order to get away from Mr. Dolinsky's harassment."  ECF No. 59-7 at 3–4.  And once reassigned, he was denied "reasonable accommodation" to return to ASPR.  *See, e.g.*, *id.* at 2 (Plaintiff claims that "[o]n November 3, 2011, [his] supervisor denied [his] request for reasonable accommodation to immediately return to [ASPR] and involuntarily extended [his] detail to TRICARE.").

To begin, the denial of Plaintiff's requests for reassignment qualifies as an adverse action under Title VII.  *See Chambers*, 35 F.4th at 872 ("[A]n employer that transfers an employee or

denies an employee's transfer request because of the employee's race, color, religion, sex, or national origin violates Title VII by discriminating against the employee with respect to the terms, conditions, or privileges of employment."). Defendant has offered legitimate, nondiscriminatory reasons for those denials. As explained below, Plaintiff was denied reasonable accommodations based on the Department's finding that he was not disabled. And in any event, denying Plaintiff's request to be sent back to ASPR—the workplace where the supervisor to whom Plaintiff attributed his "mental deterioration" appears reasonable, and hardly evidence of racial discrimination. *See* ECF No. 57-1 at 32.

Thus, the Court considers whether a reasonable jury could find that HHS's explanation is merely a pretext for discrimination. *Brady*, 520 F.3d at 494. Plaintiff proffers two of his co-workers at ASPR as similarly situated comparators: (1) a white woman named Tiffany Mulvihill who requested a reassignment at the end of 2011 which Dolinsky ultimately granted, ECF No. 57 at 23–24; ECF No. 57-2 at 85–96, and (2) Brian Sparry, a white man who in 2009 requested reassignment as an accommodation for his heart disease, which, though he was determined to not be disabled, was still granted, ECF No. 57 at 24–25; ECF No. 57-2 at 101–02.[4] But there is no evidence that Mulvihill, Sparry, or any employee besides Plaintiff was transferred multiple times. Indeed, all Plaintiff has shown is that white employees were *also* transferred and, for that matter, with *less* frequency than himself. *Cf. Walker v. McCarthy*, 170 F. Supp. 3d 94, 109–10 (D.D.C. 2016) (reasoning that "putative comparator was treated no more favorably than the plaintiff in

---

[4] Plaintiff proffers another comparator named Phillip Wise. ECF No. 57 at 23. He claims that Wise was a "Caucasian employee . . . working for Petillo at the same time as [Plaintiff.]" *Id*. But the record appears to show that Wise was in fact a disabled African-American woman. *See* ECF No. 57-2 at 80 ("You allege that you were discriminated against on the bases of your Disability (Physical), Sex (Female), and Race (Black)"). So Wise cannot be a comparator for purposes of a racial discrimination claim because she is a member of the same protected class as Plaintiff.

connection with his remote-work request" when the plaintiff requested two years of remote work and comparator was approved to work remotely but only for a limited time).[5]  Plaintiff's most potentially relevant evidence is Dolinsky's statement to EEO investigators that Mulvihill was transferred "because she was a White female, high performing, and . . . should [not] be treated worse than a low performing Black male.  Why does [Plaintiff] get something because he is a black male with an EEO complaint and she does not," referring to Plaintiff's reassignment to TRICARE.  ECF No. 57-2 at 79.  Dolinsky then opined that Plaintiff "was treated better because he was a black male with an EEO complaint, in my opinion.  Let's not forget.  Ms. Mulvihill found another job and her position was backfilled by an African American."  *Id.*  But without more, Dolinsky's view that at one point Plaintiff was reassigned, at least in part, "because he [was] a black male with an EEO complaint," *id.*, is not "a statement that itself shows racial bias in the employment decision" *not* to reassign him on other occasions, such that a reasonable jury could find racial discrimination, *see Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016).

### c.    Telework

Next, Plaintiff complains that his requests for telework were denied while white employees were permitted to telework full time.  ECF No. 57 at 24–25.  Plaintiff was not allowed to telework full-time while at the Department.[6]  As a comparator, Plaintiff again, points to Sparry.  In 2010,

---

[5] Plaintiff has also makes no attempt to show how he, Mulvihill, and Sparry are similarly situated employees.  The closest he comes is by stating that he and Mulvihill had the same supervisor in Dolinsky, ECF No. 57 at 23, but he fails to analyze Mulvihill and Sparry's job titles, work responsibilities, applicable standards, or performance history, *See Moreno-Livini v. AFL-CIO Hous. Inv. Tr.*, No. 24-cv-1392 (JEB), 2024 WL 4144112, at *3–4 (D.D.C. Sept. 11, 2024) (holding that the plaintiff's proffered comparators were invalid because the circumstances of their employment differed from the plaintiff's).

[6] There are three relevant periods for Plaintiff's telework claim: First, according to Dolinsky, while at ASPR, Plaintiff was approved to telework four days per week, the maximum allowed

Sparry was hospitalized for a heart attack and requested telework while his "ability to perform anything more than light physical activity [wa]s substantially limited and [he] lack[ed] the endurance to commute" two hours each way. ECF No. 57-2 at 107. As a result, the Department revisited its prior finding that Sparry was not disabled for Rehabilitation Act purposes and approved Sparry for full-time telework. *Id*. at 106–07. To begin, it is not clear that Plaintiff and Sparry had sufficiently similar roles at ASPR such that telework was just as possible. *Compare* ECF No. 59-10 (Plaintiff's job description at AMCG), *with* ECF No. 59-4 (Sparry's job description). But more to the point, Sparry was granted the accommodation after FOH determined that he was disabled following a heart attack and that telework would allow him to continue performing "the essential functions of his position." ECF No. 57-2 at 106. Plaintiff has provided no evidence that FOH made the same finding about Plaintiff and his asserted disabilities. In fact, FOH considered, and denied, Plaintiff's disability status. *See* ECF No. 57-2 at 43–44. Thus, Plaintiff and Sparry's situations are not comparable. *Cf. McCarthy*, 170 F. Supp. 3d at 108–10 (plaintiff whose relocation request was denied was not similarly situated to coworkers who were reassigned for other reasons). And Plaintiff has not put forth any other evidence that would allow a reasonable jury to conclude that he was denied telework because of racial discrimination. *See Walker*, 798 F.3d at 1092.

### 2.     Administrative Leave

Next, Plaintiff argues that his placement on administrative leave was discriminatory, arguing that a non-African-American employee would not face a fitness for duty examination or be

---

by ASPR. ECF No. 57-1 at 98. Plaintiff does not dispute that. *See* ECF No. 57. Second, while at TRICARE, Plaintiff teleworked four days per week. ECF No. 59-7 at 4. Finally, Plaintiff claims that at AMCG he "ha[d] not been allowed *any* telework days," which Defendant appears to concede. ECF No. 57-2 at 32; *see* ECF No. 59.

banned from the building in the same circumstances. ECF No. 57 at 25–26. Plaintiff was kept on paid leave for about five months, from March 2012 until he was cleared to return to work in August of that year. *See* ECF No. 57-1 at 79, 94. To begin, "whether placement on paid administrative leave qualifies as a material adverse action under Title VII is an open question in this Circuit." *Davis v. Vilsack*, No. 17-cv-245 (TJK), 2023 WL 6065012, *9 (D.D.C. Sept. 18, 2023) (citation omitted) ("The D.C. Circuit expressly left open the question of whether being placed on administrative leave could constitute the type of adverse action that would support a retaliation claim." (cleaned up and citation omitted)). But after *Chambers*, it seems evident that being placed on paid administrative leave qualifies as an adverse action. *See* 35 F.4th at 874–75 (rejecting "[a]ny additional requirement" beyond the "plain text" of Title VII's proscription against discrimination with respect to an employee's "terms, conditions, or privileges of employment"); *cf. Cooper v. Am. Univ.*, No. 18-cv-1970 (TSC), 2022 WL 1480030, at *1–2 (D.D.C. Apr. 6, 2022) (before *Chambers*, concluding that "placement on paid administrative leave during the employer's investigation of alleged misconduct does not itself constitute an adverse action" because it did not "cause[] an objectively tangible harm" (internal quotation marks and citation omitted)).

Defendant, for her part, asserts a legitimate, nondiscriminatory reason for the decision: Plaintiff had made alarming statements about his mental health, which he attributed to his work environment, and FOH—when contacted for guidance—concluded that "there [was] ample reason to believe that returning Mr. Porter to his previous work situation could result in harm to him and possibly others. It is recommended that he submit to a mental health fitness for duty before any such transfer" back to ASPR. ECF No. 59 at 7–8; ECF No. 57-1 at 78. So the Court must again consider whether Plaintiff has produced sufficient evidence for a reasonable jury to find that Defendant's asserted nondiscriminatory reason was pretextual, and that racial discrimination was the

real reason Plaintiff was put on administrative leave.

Again, Plaintiff tries to use Sparry as a comparator.  ECF No. 57 at 25–26.  In 2009, Sparry's workspace was moved to a different location because of a complaint that he "approached [two co-workers] in a very hostile and threatening manner," and the complainant "felt like Brian Sparry was going to hit [them]."  ECF No. 57-2 at 116.  But Sparry was not placed on administrative leave or asked to take a fitness for duty examination.  Even assuming that Sparry was similarly situated to Plaintiff in all other ways—points Plaintiff has not addressed—what caused Plaintiff's managers to fear for themselves and others were his statements that his mental health problems were "uncontrollable," that he had become "suicidal," and that his doctors were trying to commit him to a hospital.  ECF No. 57-1 at 78.  Thus, Sparry's case—in which his hostility appeared directed at two specific co-workers—was hardly the same.  And their different treatment appears to reflect those nondiscriminatory differences.  Indeed, while Sparry was not placed on administrative leave, he *was* moved to a different building to create distance with the co-workers who felt he was a danger to them.  ECF No. 57-2 at 116.  Finally, the decision to place Plaintiff on administrative leave was based on the independent advice of an "Occupational Medicine Consultant" who holds an M.D.  ECF No. 57-1 at 78.  Nothing in the record suggests that any medical professional recommended that Sparry be excluded from the office, which further distinguishes their circumstances.  In the end, the evidence to which Plaintiff points fails to suggest that his administrative leave was racially motivated such that a reasonable jury could find in his favor on the issue.

### 3.      Termination

Finally, Plaintiff argues that his termination was racially discriminatory.  For evidence, he turns again to Sparry as a potential comparator.  Plaintiff contends that when Sparry was placed on a PIP, he was provided extra help to improve his performance in the form of monthly performance evaluations and received a warning—a "Notification of Deficiency"—before being placed

on a PIP.[7]  ECF No. 57 at 26–27.  But again, because Plaintiff's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Lash*, 786 F.3d at 6 (internal quotation marks omitted) (quoting *Scott*, 550 U.S. at 380).  There is no genuine dispute of material fact about whether Plaintiff was notified of his deficient performance and given a chance to improve before he was terminated.

Plaintiff's removal was proposed by his supervisor at AMCG, Cassandra Freeman, at the end of 2014.  ECF No. 51-2.  Freeman had originally placed Plaintiff on a PIP in mid-2013 after he received an unacceptable rating on his performance review.  *Id.* at 1.  This continued Plaintiff's trend, starting in 2010, of receiving unacceptable performance evaluations from multiple supervisors.  *Porter I*, 192 F. Supp. 3d at 11; *see also* ECF No. 57-1 at 9–15.  Plaintiff alleges that he was denied any opportunity for feedback and training to help improve his job performance, but that Sparry was offered such assistance.  ECF No. 57 at 26–27.  But this contention is refuted by the record.

In February 2014, Plaintiff received formal feedback from Freeman outlining eight assignments that Plaintiff had failed to complete at a satisfactory level and noted that Plaintiff either "refused to complete the assignment" or his work required "substantial revision to be an acceptable final product."  ECF No. 57-1 at 118–30.  And Plaintiff received additional informal feedback, it appears, with some regularity.  *See, e.g.*, ECF No. 59-2 at 4.  And as already discussed, Plaintiff was given commensurate training opportunities to succeed at AMCG.  *Id.* at 2, 6–12; ECF No. 59-

---

[7] Plaintiff also argues that he was treated differently than Sparry because, "when Sparry was sentenced to jail, in order to help him, the Agency tried to *lower* his Security Clearance to eliminate the Top-Secret Security requirement in order for Sparry to keep his job."  ECF No. 57 at 26.  But Sparry was not similarly situated in this circumstance: He was under house arrest, ECF No. 57-2 at 111, and held a different job than Plaintiff, ECF No. 59-4.

1. The final decision to fire Plaintiff was made by Deputy Director Schuyler Eldridge, who found that "all the instances of unacceptable performance cited in the proposal are sustained," and that Plaintiff had "attended numerous trainings" yet failed "to apply the various trainings" to "day to day work assignments." ECF No. 51-3 at 1–2. There is no evidence that Plaintiff was treated any differently than Sparry or any other employee in connection with his PIP and termination, and so a reasonable jury could not find that his termination was based on racial discrimination.

### B.    Retaliation (Claims III and VII)

Plaintiff also brings a retaliation claim under Title VII, under which federal employers may not retaliate against an employee who "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). "To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)). Then, under the familiar *McDonnell Douglas* burden-shifting framework, the burden shifts to the defendant to provide "a legitimate, nondiscriminatory [or non-retaliatory] reason" for its actions. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks and citation omitted). At that point, the *McDonnell Douglas* framework "disappear[s]," *id.* at 142–43, and rather than evaluate the plaintiff's prima facie case, the court asks if "a reasonable jury could find that the defendant's proffered reasons are pretextual and that the real impetus for the adverse action was discriminatory or retaliatory animus," *Salak v. Pruitt*, 277 F. Supp. 3d 11, 21–22 (D.D.C. 2017) (citing *Brady*, 520 F.3d 490 at 494; *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003)).

The record is clear that Plaintiff engaged in protected activity by bringing an EEO

complaint in 2010. Soon after, he was transferred to TRICARE and, on the eve of his return to ASPR, was placed on administrative leave and instructed to undergo a "fitness for duty" mental examination before he could return.[8]

The Department defends Plaintiff's reassignment to TRICARE by pointing out that "Plaintiff requested that he be reassigned so that he would no longer be working under the supervision of Mr. Dolinsky and Mr. Petillo." ECF No. 59 at 17; *see also id.* at 17 n.14 ("[T]he detail to TRICARE was done in response to Plaintiff's request for a reasonable accommodation."). Fair enough. *See, e.g.*, ECF No. 59-7 at 3–4 (Plaintiff's affidavit that by the time he was sent to TRICARE he "had been requesting a detail for over a year in order to get away from Mr. Dolinsky's harassment."). But Defendants do not grapple with or try to explain the crux of Plaintiff's complaint of retaliation: that on assignment to TRICARE he was given nothing to do for months on end. ECF No. 1 at ¶ 13 ("Plaintiff asked to have a normal job with work to do in order to stay busy as a reasonable accommodation. However, David Dolinsky refused to let the Plaintiff work out of retaliation for his prior EEOC activity."); ECF No. 57-1 at 34 (2011 email from Plaintiff asking "Where did the position description for this detail that I am on come from? It does not remotely resemble what I am being asked to do at TRICARE. This is because I am being asked to do absolutely nothing on this detail."); ECF No. 59-7 at 4. And "regardless of whether [he] requested the reassignment, the fact that [he] suffered a drastic reduction, both quantitative and

---

[8] Plaintiff tacks on a smorgasbord of claimed adverse actions in retaliation for his protected EEO activity, the rest of which can be summarily rejected. *See* ECF No. 57 at 39–45. As explained above, there is no genuine dispute of material fact as to whether any denial of accommodation or disciplinary action for poor performance was discriminatory, and Plaintiff has offered nothing to suggest that retaliatory animus motivated any of these actions. Similarly, in Claim VII, he alleges that his termination was retaliatory. But for similar reasons discussed above in the discrimination context, a reasonable jury could not find that the legitimate, nonretaliatory reasons given by the Department for Plaintiff's termination were pretexts for retaliation.

qualitative, in work assignments and responsibilities constituted an adverse employment action." *Thomas v. Vilsack*, 718 F. Supp. 2d 106, 122 (D.D.C. 2010); *see also Saunders v. Mills*, 172 F. Supp. 3d 74, 86 (D.D.C. 2016) ("[R]etaliatory conduct need only dissuade[] a reasonable worker from making or supporting a charge of discrimination.") (internal quotation marks and citation omitted).

Furthermore, Plaintiff filed his final amended EEO complaint about the claims at issue in *Porter I* on December 22, 2010, and the agency issued its Final Decision in that matter on June 3, 2011. 192 F. Supp. 3d at 12. Crucially, participation "in an investigation, proceeding, or hearing on the basis of discrimination" is a protected activity under Title VII. *Arias v. Marriott Int'l, Inc.*, 217 F. Supp. 3d 189, 195 (D.D.C. 2016) (internal quotation marks and citation omitted). Thus, Plaintiff "engaged in protected activity during the period when [he] also experienced reduced work assignments," which satisfies the causal connection requirement for his prima facie case. *Holcomb*, 433 F.3d at 903; *See also Singletary v. D.C.*, 351 F.3d 519, 524 (D.C. Cir. 2003) (requiring "a causal connection between" an adverse employment action and a plaintiff's engagement in protected activity).[9]

Plaintiff also asserts that his placement on administrative leave was retaliatory. Recall that when Plaintiff was set to return to ASPR in March 2012, Dolinsky discovered that, a few months before, Plaintiff had made representations in a court filing about his mental health: that he had

---

[9] The Department also attacks Plaintiff's allegation that "[o]n March 21, 2012, David Dolinsky demanded that [he] complete additional work for [HHS] while [he] was on a detail at the Department of Defense. When [Plaintiff] stated that he could not perform work for two departments at a time, David Dolinsky threatened to terminate [him]." ECF No. 1 at ¶ 15. The Department argues that "Plaintiff cannot have it both ways, claiming that he was discriminated against by having no work to do, but then claiming he was given more than he could handle." ECF No. 51 at 12. But even assuming any evidence supports this allegation, Dolinsky did not require Plaintiff to take on additional work until March 21, 2012, almost a full year after Plaintiff begun his detail at TRICARE.

become "suicidal," and that his doctors were trying to commit him to a hospital.  ECF No. 57-1 at

78, 84–86.  As a result, the agency—citing "safety concerns"—placed Plaintiff on immediate ad-

ministrative leave while FOH assessed his fitness for duty.  *Id.* at 32–33, 78–84.  He was ultimately

cleared to return to work in August.  *Id.* at 94.  On this front, Defendants argue that "the agency

took the necessary actions to protect its employees and Plaintiff prior to his return to the office,

based on a credible fear of employee safety due to Plaintiff's alarming comments surrounding his

mental state."  ECF No. 59 at 8.

       But Plaintiff offers some evidence that this action was linked to his prior EEO activity.

Plaintiff cites evidence of Dolinsky's frustration with his use of the EEO system and animus to-

wards him for that reason.  ECF No. 57-2 at 94–96.  Dolinsky told EEO investigators that, when

another employee requested a transfer, he "expect[ed] an EEO complaint . . . [n]ot that it would

have any basis, but it would take up the rest of my time not spent on EEO already," referring to

Plaintiff.  *Id.* at 94.  Dolinsky then expressed frustration that "it could be said" that he did not "let

a white female have a detail" while "a black male"—Plaintiff—was treated differently because of

his EEO activity.  *Id.* at 95–96; *see also id.* at 79.  And when asked about any animus toward

Plaintiff, Dolinsky stated that "Porter has abused the EEO process" and "[a]t this point, I wouldn't

be human if I didn't" have such animus.  ECF No. 57-1 at 6.

       Moreover, this was not the first time that Plaintiff had raised mental health concerns with

his supervisors.  For example, in November 2011 while on detail at TRICARE, Plaintiff told Do-

linsky that he was "having a lot of medical issues now concerning my depression," and "[m]y

psychiatrist and psychologist have even been asking me to check into a hospital because of my

depression."  ECF No. 57-1 at 34.  But Dolinsky took no action.  *Id.* at 88–89.  It was not until the

following March—when Plaintiff would have returned to Dolinsky's supervision within a matter

of days—that Dolinsky went to the trouble of discovering Plaintiff's other statement about his mental health and then placed Plaintiff on leave. *Id.* at 85–86.

True, there is substantial evidence supporting the Department's argument that Plaintiff's placement on administrative leave was not retaliatory. The decision to place Plaintiff on administrative leave was not made until after a doctor determined that Plaintiff was a threat to himself and others and should be submitted "to a mental health fitness for duty examination before" returning to the office. ECF No. 57-1 at 78–81. And the doctor learned of the contentious relationship between Plaintiff and his supervisors, as well as his mental health issues, after being emailed by a human resources worker, rather than Dolinsky. *Id.* at 32. Furthermore, Petillo stated that the decision to place Plaintiff on administrative leave was made "in consultation with the HHS Office of General Counsel, Labor and Employee Relations and Federal Occupational Health, all of whom concurred with the need for a medical assessment and placement on administrative leave." ECF No. 57-1 at 90. Collectively, this evidence distances Dolinsky's animus toward Plaintiff because of his EEO activity and the decision to place him on administrative leave.

Still, the record is murky on Dolinsky's exact involvement in that decision. Dolinsky stated that he "signed and delivered a letter to [Plaintiff] placing him on administrative leave." ECF No. 57-1 at 85. And that letter began: "Effective immediately, I am placing you on administrative leave." *Id.* at 79. Finally, in a memo sent to Plaintiff outlining the requirements for completing his fitness for duty examination, Dolinsky wrote that "Jay Petillo and I have concerns about the safety of yourself and others in the workplace." *Id.* at 80. Thus, the record does not seem to rule out significant involvement by Dolinsky, a supervisor for whom there is evidence of animus

directed at Plaintiff because of his EEO activity.[10]

In the end, it is possible—perhaps even likely—that Defendant will be able to convince a jury that the real reason Plaintiff was placed on leave was not retaliatory.  But on this record—given the evidence of Dolinsky's animus, the unclear nature of his involvement in the administrative leave decision, and the prohibition on the Court's weighing of the evidence in resolving a summary judgment motion—in the Court's view, a reasonable jury could find to the contrary.  So it must deny Defendant's motion for summary judgment on Plaintiff's retaliation claim, termed as Claim III in the complaint, insofar as it relates to his detail at TRICARE and his placement on administrative leave.

### C.    Hostile Work Environment (Claims IV and VI) [11]

Plaintiff abandoned his hostile-work-environment claim in his opposition to summary judgment.  *See* ECF No. 57.  Thus, the Court considers that claim abandoned, though some courts have noted that "where the silent party is *pro se*, abandonment is only generally granted where an intention has been expressed to abandon the claim."  *Bannister v. Luis*, No. 18-cv-7285 (EK) (ST), 2022 WL 19402511, at *2 (Oct. 27, 2022) (citing *Omosefunmi v. Weiss*, 198 F.3d 234 (2d Cir. 1999)).  At any rate, even if Plaintiff's briefing were construed to preserve a hostile-work-environment claim, it would fail to show anything approaching the "severe or pervasive" standard for

---

[10] Like his reduction in work responsibilities at TRICARE, Plaintiff was put on administrative leave "during the period when" he was litigating the *Porter I*, a protected activity, further evidence from which a jury could find a causal connection between such activity and his placement on leave.  *Holcomb*, 433 F.3d at 903.  Indeed, as described above, Plaintiff's filings in the *Porter I* case led to his placement on leave.

[11] In his complaint, Plaintiff brings one count of "Hostile Working Environment," ECF No. 1 at 25, and another for "Harassment," *Id.* at 26, without further specification.  The Court treats Claim VI—"Harassment"—as part-and-parcel with Plaintiff's hostile-work-environment claim; regardless, Plaintiff pursues neither in his opposition to summary judgment.

"abusive working environment[s]." *See Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). For a hostile workplace claim to succeed, a plaintiff must show that the workplace environment was permeated "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Barbour v. Browner*, 181 F.3d 1342, 1347–48 (D.C. Cir. 1999). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

Plaintiff has not carried this burden. His primary complaint appears to be conduct underlying his prior Title VII lawsuit, not this one. *See* ECF No. 57 at 4; ECF No. 57-1 at 16–22 (reciting events from 2010). And though hostile work environments require "a course of conduct—as distinct from a discrete act—often 'occur[ing] over a series of days or perhaps years,'" Plaintiff has pointed to nothing in the relevant period that would suggest a continuing violation. *Fields v. Vilsack*, 207 F. Supp. 3d 80, 93 (D.D.C. 2016) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). The allegations Plaintiff does cite are not sufficiently "severe or pervasive" as to alter the conditions of his employment. *Baloch*, 550 F.3d at 1201. And they are undercut by the legitimate justifications proffered by Defendant in letters of reprimand, PIPs, and Plaintiff's removal, and so get Plaintiff nowhere. *See Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) ("Plaintiff must show far more than . . . occasional off-color remarks or criticisms, and snubs or perceived slights to establish a hostile work environment."); *McCallum v. Mayorkas*, No. 21-cv-1911 (ABJ), 2023 WL 3203011, at *17 (D.D.C. May 2, 2023) ("[E]ven though plaintiff experienced several incidents when she was treated unfairly in her view, and she attributes those events

to discrimination based on her gender or race or both, plaintiff has not alleged any facts that connect any of the actions taken to her membership in a protected class."). So the Court finds that on this record, it must grant Defendant's motion for summary judgment on Plaintiff's hostile work environment claim.

### D.  Rehabilitation Act and ADA (Counts II and V)

Finally, Plaintiff brings a disability-discrimination claim under the Rehabilitation Act and ADA. The Court first considers the Rehabilitation Act, which prohibits employers from discriminating against an employee because of a disability. *See* 42 U.S.C. § 12112(a); *Woodruff v. Peters*, 482 F.3d 521, 526–27 (D.C. Cir. 2007). As under Title VII, Plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McGill v. Munoz*, 203 F.3d 843, 845 n.2 (D.C. Cir. 2000). And "[t]o sustain a disability claim under the Rehabilitation Act, a plaintiff must as a threshold matter establish that he or she has a disability." *Klute v. Shinseki*, 840 F. Supp. 2d 209, 215 (D.D.C. 2012). The Rehabilitation Act defines disability as "a physical or mental impairment that substantially limits one or more major life activities," which includes working. *Rand v. Geithner*, 609 F. Supp. 2d 97, 102 (D.D.C. 2009) (citing 29 U.S.C. § 705(20)(B)). EEOC regulations explain that "*substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." *Id.* at 103 (quoting 29 C.F.R. 1630.2(j)(3)(i)). Plaintiff, here, does not meet that burden.

Plaintiff cites a history of depression, panic attacks, post-traumatic stress disorder, and generalized anxiety disorder, for which he has been receiving treatment in various forms since the 1990s. ECF No. 57 at 30–31. These are the same conditions which, in his earlier suit, the judge determined did "not qualify as 'disabilities' within the meaning of the Rehabilitation Act." *Porter I*, 192 F. Supp. 3d at 16–17. As noted in *Porter I*, "an impairment that can be alleviated by changing supervisors does not constitute a 'disability' under the Act." *Id.* at 16 (citing *Rand*, 609 F.

27

Supp. 2d at 103–04).  And there, the court reasoned that Plaintiff's impairments could not qualify as a disability under the Act "because he admits that they would be alleviated by a change in supervisor and/or office."  *Id.* at 17.  At least at that time, the court explained, "Porter's 'impairments' have only inhibited him from working for one supervisor, Dolinsky."  *Id.*  Plaintiff's conditions predated April 2010, when he began working for Dolinsky, but they did not limit his ability to work at any time before that point.  *Id.*

The question now is whether anything has changed.  *See Kimberly H. v. Kijakazi*, No. 22-cv-00417 (GMH), 2023 WL 4450131, at *7 (D.D.C. July 11, 2023) (court's determination of a plaintiff's disability status did not preclude adjudication of same plaintiff's disability status in different time frame).  Plaintiff argues that he has had these disabling conditions for over thirty years and, in the period from 2011 through 2015, worked with a series of supervisors in several work environments, none of which fully alleviated his impairments.  ECF No. 57 at 29; *see also* ECF No. 57-1 at 32 ("the employee has been on a detail that is geographically distant from his permanent duty site and at a location where none of his regular managers report for duty").  For this reason, the Court finds that *Porter I* is not dispositive as to Plaintiff's disability status.  But the problem for Plaintiff is that he has offered no competent medical evidence from which a reasonable jury could conclude that he was disabled under the Act, that is, that he has "a physical or mental impairment that substantially limits one or more major life activities," including working.  42 U.S.C. §§ 12102(1), (2)(A).

To show the history and severity of his impairments, Plaintiff catalogues the following evidence: a note from his doctor documenting treatment from 2007 to 2008 for anxiety, ECF No. 57-2 at 130, a summary of a conversation with his psychologist that discusses his limited coping skills and Generalized Anxiety Disorder diagnosis*, id.* at 131–32, and his deposition testimony that

he has had an anxiety disorder since college, experiences panic attacks, was diagnosed with major depression, and suffers from post-traumatic stress disorder, ECF No. 51-1 at 24–25.  He does not attach any medical records beyond the note from his doctor, except to explain in his deposition that medical records were given to the agency at some point.  *See id.* at 25.  But "[t]o establish a disability, [m]erely submitting a medical diagnosis of an impairment is insufficient to establish disability status."  *Osborne v. Eisner*, 696 F. Supp. 2d 73, 75 (D.D.C. 2010) (internal quotation marks and citation omitted).  Instead, a plaintiff "must offer evidence that the extent of the limitation" qualifies as "substantial" under the Act.  *Id.* (internal quotation marks and citation omitted). Plaintiff does not offer such evidence, and so he has not created a genuine issue of material fact as to whether he was disabled under the Rehabilitation Act.[12]

Finally, because the standard for whether a person is disabled under the Rehabilitation Act is the same as that under the ADA, Plaintiff's ADA claims also fail.  29 U.S.C. §§ 705(9)(B), 794(d); *see Porter I*, 192 F. Supp. 3d at 16.

---

[12] In his opposition to Defendant's motion, Plaintiff argues that Defendant "regarded" him as disabled by pointing to his placement on administrative leave, subjection to a fitness for duty examination, and the "Misconduct or negligence in employment" section of his Top Secret security clearance form.  ECF No. 57 at 32.  In *Epps v. Potomac Elec. Power Co.*, the court held that the plaintiff was "regarded" as disabled because the defendant "concluded that Plaintiff was unable to return to her previous job on account of her disability."  389 F. Supp. 3d 53, 63–64 (D.D.C. 2019). No reasonable jury could find that was the case here.  Plaintiff was placed on administrative leave and asked to take a fitness for duty examination to determine whether he was, in fact, disabled such that he would be unable to return to work.  ECF No. 57-1 at 78.  This decision was based on Plaintiff's own statements in prior court filings.  *Id.*  By August 28, 2012, FOH determined that Plaintiff's mental health issues made him a threat to neither himself nor others and that he could return to work.  *Id.* at 94.  Subsequently, Plaintiff was declared suitable to hold a Top Secret security clearance.  *Id.* at 102–07.  Defendant's actions reflect an effort to determine Plaintiff's disability status, but that he was ultimately (1) allowed to return to work, and (2) granted a Top Secret security clearance refutes the idea that he was ever "regarded" as disabled by Defendant.  *See Epps*, 389 F. Supp. 3d at 63–64 (holding that the plaintiff was "regarded" as disabled because the defendant refused to allow the plaintiff to return to work "on account of her disability").

**IV.    Conclusion**

For all the above reasons, the Court will grant in part and deny in part Defendant's motion for summary judgment.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 13, 2025